2015 AUG 10 AM 8:41
COURT OF APPEALS DIV I

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| In the Matter of the Marriage of<br>GILLIAN BEN-ARTZI, | ) ) ) | No. 72063-5-I |
| Respondent, | ) ) | |
| and | ) ) | UNPUBLISHED OPINION |
| ERIC BEN-ARTZI, | ) ) ) | |
| Appellant. | ) ) | FILED: August 10, 2015 |

SCHINDLER, J. — Dr. Eric Ben-Artzi appeals entry of the decree of dissolution, the findings of fact and conclusions of law, the order of child support, and the parenting plan. He challenges (1) the imposition of international travel restrictions under RCW 26.09.191(3)(g), (2) imputing income to him for purposes of calculating child support, (3) the division of property, (4) the award of maintenance, and (5) the award of attorney fees. We affirm in all respects.

FACTS

Eric Ben-Artzi was born and raised in Israel. He served in the Israeli Navy from 1993 until 1996. In 1996, Ben-Artzi came to the United States to attend graduate school at Northwestern University. From 1997 until 1998, he worked at J.P. Morgan in

New York. From 1998 until 2006, he was enrolled in the PhD program at the Courant Institute of Mathematical Sciences at New York University.

Gillian Hopson grew up in Granville, Ohio. In 2004, she moved to New York to obtain a master's degree in education. Gillian started dating Ben-Artzi in May 2005.[1]

After obtaining his PhD in 2006, Dr. Ben-Artzi worked as a trader at Citigroup earning a base salary between $125,000 and $150,000. Dr. Ben-Artzi and Gillian married on September 23, 2006. Dr. Ben-Artzi worked at Citigroup and Gillian taught English at a high school in the Bronx. Approximately a year later, Gillian gave birth to their first child.

From 2007 until 2010, Dr. Ben-Artzi worked as a vice president and strategist at Goldman Sachs earning approximately $132,500 a year. From February 2009 until September 2010, the family lived in Granville, Ohio, and Dr. Ben-Artzi commuted to work at Goldman Sachs in New York.

In June 2010, Dr. Ben-Artzi left Goldman Sachs to work as a vice president and "quantitative risk officer" at Deutsche Bank. From September 2010 until December 2011, the family lived in New Jersey. In 2011, Dr. Ben-Artzi earned approximately $160,000.

In March 2011, Dr. Ben-Artzi reported concerns about "possible securities law violations and financial fraud" to the Deutsche Bank compliance office and to the United States Securities and Exchange Commission (SEC). After telling his supervisor that he had reported his concerns to the SEC, Deutsche Bank began an "internal investigation."

---

[1] We refer to Gillian Ben-Artzi by her first name for clarity. No disrespect is intended.

In June, Gillian gave birth to their second child. Dr. Ben-Artzi took a paternity leave and returned to work at Deutsche Bank in October 2011.

On November 4, Dr. Ben-Artzi filed a whistleblower complaint with the SEC alleging Deutsche Bank "fail[ed] to accurately report the value of its credit derivatives portfolio." On November 7, Deutsche Bank terminated Dr. Ben-Artzi.

In January 2012, the family moved to Bellingham, Washington. On May 1, Dr. Ben-Artzi's attorneys filed a 34-page wrongful termination complaint against Deutsche Bank with the United States Department of Labor Occupational Safety and Health Administration (OSHA). The complaint alleged retaliation in violation of the federal Sarbanes-Oxley Act of 2002.[2] Dr. Ben-Artzi sought economic and noneconomic damages, including lost wages and emotional distress damages. Dr. Ben-Artzi spent nearly all of his time working on the SEC and OSHA actions.

On March 26, 2013, Gillian filed a petition for dissolution of the marriage in Whatcom County Superior Court. The court entered a temporary restraining order prohibiting "both parties" from "transferring, removing, encumbering, concealing, damaging or in any way disposing of any property except in the usual course of business or for the necessities of life or as agreed in writing by the parties." The order specifically states:

> Both husband and wife are now required to obey the following order
> unless the court changes it. Either of you may ask the court to change or
> clarify this order. The court has the power to punish violations of this
> order and to require the violator to pay attorneys' fees to the other party
> for having to bring the violation before the court.

---

[2] 18 U.S.C. § 1514(a)(1), (2).

On May 1, Gillian filed a motion to relocate to Granville, Ohio, where she had "a family support network to help with childcare." In her declaration in support, Gillian states Dr. Ben-Artzi "has been unemployed for 18 months and I would like to return to work in order to support my family, provide benefits, and create a stable life for me and our children." Dr. Ben-Artzi opposed relocation.[3] Gillian also asked the court to enter an order restricting his "ability to remove the children from the country without court permission." Gillian asserted Dr. Ben-Artzi is an Israeli citizen and he had threatened to take the children to Israel. Her declaration states, in pertinent part:

> I believe there is also the strong possibility that [Dr. Ben-Artzi] could return to Israel, where he has family and he might have help finding employment. Eric is an Israeli citizen and has never completed the process of becoming an American citizen despite obtaining a green card five years ago. To keep his options open, he has postponed becoming [a] U.S. citizen because he wants to avoid U.S. taxes if he moves to another country. Recently, he threatened to move back to Israel if the court approves a child-support order he doesn't like. I am very concerned about Eric's threats regarding Israel. He seriously scared me when he described family law in Israel as a non-Jewish mother having no rights and that therefore he would have custody. I am asking for a provision in the parenting plan to address this issue by limiting Eric's ability to remove the children from the country without court permission.

The court granted the motion to relocate. The court found Dr. Ben-Artzi's opposition "seems intended to block the Mother's efforts for his personal benefit instead of the children's best interests" and "may be intended to gain financial or tactical advantage in the dissolution." Pending entry of a temporary parenting plan, the court prohibited Dr. Ben-Artzi from removing the children from Washington State.

---

[3] According to Gillian, in April 2013, Dr. Ben-Artzi said he would let her relocate to Ohio with the children if she did not ask for any money in the dissolution, including child support.

On June 1, Gillian and the children moved to Ohio. Dr. Ben-Artzi moved to Ohio and got a job at Ohio State University teaching a math course during the fall term. On July 26, the court entered a temporary parenting plan. The plan designates Gillian as the residential parent and imposes travel restrictions, "Both parents are restrained and prohibited from international travel with a child, until final orders are entered."

On October 31, the court entered a temporary order of child support. The court found Dr. Ben-Artzi was "voluntarily underemployed" and imputed net monthly income based on a "reliable historical rate of pay." The court ordered him to pay Gillian $1,929 a month in child support, health care, and day care expenses. The court also awarded Gillian $250 in attorney fees and ordered Dr. Ben-Artzi to pay Gillian within 45 days.

The dissolution trial was scheduled to begin on January 14, 2014. On November 7, 2013, Gillian filed a motion to compel discovery and to strike the settlement conference and the trial date. Gillian asserted Dr. Ben-Artzi had not provided "any responses to the discovery" including the response to interrogatories and requests for production "due on October 23." On November 14, the court granted the request to strike the settlement conference and the trial date and entered an order requiring Dr. Ben-Artzi to "provide full and complete responses" to the discovery requests by January 30, 2014. The court rescheduled the trial to April 22, 2014.

In December 2013, Dr. Ben-Artzi notified Ohio State University that he was "actively" looking for a higher paying job and "might not complete the term if there is an offer." Ohio State did not offer Dr. Ben-Artzi a teaching position for the spring semester.

On December 31, the court entered an order finding Dr. Ben-Artzi in contempt for "intentionally fail[ing] to comply" with the temporary order of child support and the order to pay attorney fees. The order states he could purge the contempt by paying Gillian $800 within 30 days. On January 24, 2014, the court ordered Dr. Ben-Artzi to make "payment in full of all child support ordered" within 10 days.

On February 21, 2014, Gillian identified Kenneth Brewe as an expert to testify at trial regarding the SEC whistleblower and the OSHA wrongful termination actions.

> Mr. Brewe will testify about his opinion regarding the nature and scope of any proceeds regarding Respondent's damages, claims, complaints, wages, compensation, rewards, and entitlements etc., as a party, witness, whistleblower or any other such capacity in any litigation, case, cause, claim, wrongful discharge, administrative proceeding, or any other such action, [OSHA], [SEC], or any other such person, agency, entity, business, employer, or third party with respect to any action.

On March 10, Gillian filed a "Motion and Declaration for Order to Show Cause Re Contempt for Violation of Restraining Order and Discovery Order." Gillian argued Dr. Ben-Artzi violated the temporary restraining order entered March 26, 2013 by withdrawing over $100,000 from their IRA.[4] Gillian states that before the separation, the account balance was $142,201. Gillian also asserts Dr. Ben-Artzi violated the November 14, 2013 order to provide "full and complete responses" to discovery by January 2014, did not "produce any discovery by this deadline," and only recently produced "a fraction of what was required."[5] Gillian states Dr. Ben-Artzi had not provided complete answers or responded to over 100 requests related to the pending SEC and OSHA actions including financial information regarding the SEC and OSHA

---

[4] Individual retirement account.

[5] Emphasis in original.

actions, expenses, or the names and addresses of witnesses.[6]

On March 21, the court entered an order of contempt against Dr. Ben-Artzi and a "Second Order to Compel Respondent to Produce Discovery and for Sanctions." The court found Dr. Ben-Artzi in contempt for withdrawing "not less than $100,733 from the community IRA" and failing to provide "full and complete responses" to discovery as previously ordered. The court found Dr. Ben-Artzi "again failed to produce . . . discovery response[s] by the deadline as ordered" and "refused to deliver (actually mail) his discovery responses to Petitioner's attorney as required." The court found his "actions have been in bad faith and constitute intransigence." The court ordered Dr. Ben-Artzi to provide "a full and complete accounting" of all withdrawals from the IRA within seven days, provide "full and complete discovery responses" signed under oath within five days, and pay $825 in attorney fees within ten days. The order states Dr. Ben-Artzi

---

[6] Gillian's declaration in support of the Motion for Order to Show Cause Re Contempt for Violation of Restraining Order and Discovery Order states, in pertinent part:

> [The discovery requests] sought disclosure regarding . . . whether [Dr. Ben-Artzi] had "made any financial arrangements, liens, loans, contingencies, contracts, loans [sic], interest-sharing, or any other such monetary agreement, whether or not it has been realized, vested or unvested, and if so, state the following: (a) name, address and phone number of any person, agency or entity with whom you made such an agreement; (b) the purpose and details of such agreement; (c) the date and terms of such agreement; (d) whether you consulted with or obtained the agreement of your wife with respect to such agreement, and if not, why not; (e) if any funds, money, compensation or benefit were received by you due to any such agreement, what was the amount of such funds, the disposition of such funds and the dates pertaining thereto; (f) if any funds, money, compensation or benefit were loaned or distributed by you to any person, agency or entity with whom you made such an agreement[,] what was the amount of such funds, the source of funds, the character of the funds (separate or community), if community funds whether your wife was consulted with or agreed to use of community funds and if not why not, and the dates pertaining to all transactions regarding such funds or other benefits." Respondent's answer was incomplete and vague. It confirmed the existence of such information and third parties, but provided no details such as contact information or details of the third party agreements. For example, in subsection (e) Dr. Ben-Artzi states "funds were transferred to me under one of the confidential agreements," but he does not disclose the amount of funds, the source of funds or the purpose. Regarding subsection (f), Dr. Ben-Artzi states that he has a profit-sharing arrangement with unnamed interested parties. One of these may be his "business partner," Adrian Fournier de Launay of the Fournier Law Firm, listed in response #177, but he does not disclose the nature of the legal contract or terms.

could purge the finding of contempt by providing "full and complete records" and paying $2,200 in attorney fees within seven days.

On April 10, the court held a contempt review hearing. The court found Dr. Ben-Artzi did not comply with the conditions of the March 21 order of contempt or the second order to compel discovery, and he did not "make any efforts to comply with the underlying orders for which he is in contempt of court." The court found his "actions continue to be in bad faith and intransigence." The court found Gillian "incurred attorney fees solely due to Respondent's intransigence and failure to comply with discovery rules and court orders, for which she should be compensated." The court ruled Dr. Ben-Artzi remained in contempt of court, ordered him to "provide full and complete discovery responses as previously ordered," and assessed a $250.00 "daily monetary penalty" that shall continue until compliance and further order of the court. The court also ordered Dr. Ben-Artzi to pay $412.50 in attorney fees to Gillian within seven days.

Before trial, Gillian filed a motion to impose discovery sanctions under CR 37. The court granted the motion. The court found Dr. Ben-Artzi did not comply with the orders compelling discovery, and the responses he provided on February 18, 2014 "were a fraction of what was required, were not correctly identified, were not under oath or dated, and an extensive amount of documents were missing or unanswered." The court also found Dr. Ben-Artzi "failed to appear for his deposition despite repeated requests for coordination and proper notice." The court found Dr. Ben-Artzi's actions "have been willful, in bad faith and constitute intransigence." The court entered an order prohibiting Dr. Ben-Artzi "from introducing any evidence at trial that was the subject of

8

Petitioner's discovery requests which [he] did not answer." The order states, in pertinent part:

> The discovery sought by [Gillian] is essential for her preparation of the case. Petitioner has been harmed by [Dr. Ben-Artzi]'s failure to comply with discovery rules and court orders. Petitioner would be unfairly prejudiced at trial and unable [to] proceed with trial due to Respondent's failure to comply, if this order were not entered. Petitioner's due process rights to a fair trial would be violated if Respondent's misconduct was not sanctioned and Petitioner protected by this order.

The night before the trial was scheduled to begin on April 22, Dr. Ben-Artzi sent an e-mail to the court stating he had missed his flight to Washington and would "call tomorrow morning to see how quickly this can be rescheduled." Dr. Ben-Artzi did not call the next morning but sent another e-mail stating he might be able "to travel to Court" the following day. The court continued the trial and instructed Dr. Ben-Artzi "to attend by telephone tomorrow morning."

Dr. Ben-Artzi called the next morning. However, he almost immediately asked to take a break. The court told Dr. Ben-Artzi to "call the Court back within the next 10 minutes and we'll proceed." After waiting for almost an hour, the court proceeded with the trial. Dr. Ben-Artzi never called back.

The issues at trial were the parenting plan, the order of child support, the division of property including the IRA and the characterization and disposition of any proceeds from the SEC and OSHA actions, and Gillian's request for maintenance and attorney fees.

Gillian testified that Dr. Ben-Artzi threatened to abscond with the children to Israel. Gillian also testified Dr. Ben-Artzi threatened to "leave the country and never pay me anything." Gillian said Dr. Ben-Artzi is an Israeli citizen with "very high connections"

9

in the Israeli government and she was concerned "he will use that power to somehow hurt me in a variety of ways, including taking the children." Gillian said Dr. Ben-Artzi told her that "a mother who is not Jewish . . . would have no rights in Israel compared to a Jewish father with the connections that he has."

The parties owned no real property. The property subject to division primarily was the Charles Schwab IRA and the SEC and OSHA actions. The court admitted into evidence a number of exhibits including bank records for the joint IRA, copies of the SEC whistleblower and OSHA wrongful termination complaints, and copies of Dr. Ben-Artzi's resume and earnings statements from his previous employers. The court also considered the memorandum submitted by Brewe.

Gillian testified that during the marriage, Dr. Ben-Artzi expended community funds on the SEC and OSHA actions and made a number of trips to the East Coast to meet with attorneys and others. Gillian testified Dr. Ben-Artzi also retained an investment firm in Toronto, Canada, The Kilgour Williams Group, to work on the SEC action.

> [Dr. Ben-Artzi] devoted a lot, a great deal of time and money and energy into those cases. They were very important to him and he, this was truly his first priority and he had to pay I know, I believe — I haven't, I think we asked for the attorney's agreement with [the attorney] but we didn't see it, but I believe from my conversations with [Dr. Ben-Artzi] that [the attorney] asked for some of his expenses [to] be paid up front. He works primarily on contingency but there were some up front costs and fees and expenses and I know those were thousands of dollars and we paid those in 2012.

Gillian's expert Brewe addressed whether the SEC and OSHA actions were community property. As to the SEC whistleblower action, Brewe stated that because Dr. Ben-Artzi "filed an actual claim for [an] award with the SEC," Dr. Ben-Artzi's interest

10

"is vested." Brewe states that because Dr. Ben-Artzi "discovered the alleged violations by Deutsche Bank and reported them during the marriage[,] contingent upon the SEC acting against Deutsche Bank and sanctions being imposed, . . . the claim [is] a community asset."

As to the OSHA wrongful termination action, Brewe states the "pain and suffering portion of a personal injury award recovered by a spouse from a third person is the separate property of the injured person." However, he notes that "any amount intended to redress lost earnings or medical expenses paid from the community property funds will be deemed community property" and, therefore, "[a]ny recovery compensating Mr. Ben-Artzi for economic loss during the marriage should be considered community property."

At the conclusion of trial, the court made a tentative oral ruling subject to written objections by Dr. Ben-Artzi.

> I'm going to announce the decisions that I'm provisionally making in this case. I'm also going to issue an order requiring that Dr. Ben-Artzi file with the Court any objections he has to the proposed findings that I'm about to announce and that those objections be filed in writing on or about May 1st, 2014. If . . . Dr. Ben-Artzi wishes to testify or bring other factual information to the Court's attention regarding these points he may do so in writing on or before May 1st, 2014, however, any documentary evidence that he provides won't be considered by the Court unless that documentary evidence was also provided in discovery. And that's the implementation of the Court's order on motion in limine.

The court found Dr. Ben-Artzi misappropriated over $100,000 of community funds from the Charles Schwab IRA. The court awarded Gillian the remaining funds in the IRA. The court ruled that if Dr. Ben-Artzi "does not pay all amounts remaining in that account to [Gillian] as I've just ordered then I will issue a judgment in her favor" for $33,376. Based on "all of the circumstances," the court awarded Gillian "a full 50-

11

percent share of the net proceeds" of the SEC whistleblower and OSHA wrongful termination actions and all other litigation related to the termination from Deutsche Bank.

The court ruled that absent a court order, Dr. Ben-Artzi was prohibited from traveling with the children outside the United States. The court ruled it was "reasonable to impute income to Dr. Ben-Artzi at the $100,000 level" based on "his historic earning levels." The court found Gillian incurred additional attorney fees based on Dr. Ben-Artzi's intransigence and ruled she was entitled to an attorney fee award of $68,493.

The next day, the court sent the transcript of the oral ruling to Dr. Ben-Artzi setting a deadline of May 8 to submit written objections. The letter states, in pertinent part:

> As the ruling indicates, Dr. Ben-Artzi may submit written argument and any documents he disclosed in discovery and considers pertinent to the issues at trial. I will consider any submission he makes and will issue a final ruling after that.

On May 7, Dr. Ben-Artzi filed "Respondent's Written Testimony and Objections." Dr. Ben-Artzi argued some funds in the IRA were separate property and objected to awarding Gillian the remaining funds because he "viewed the withdrawals from our IRA as required for the 'necessities of life.' " Dr. Ben-Artzi argued the court should award him "a greater share of the proceeds" from the SEC and OSHA actions based on his "post-separation efforts to increase the likelihood and value of a recovery." Dr. Ben-Artzi stated the "work and expenses involved in the SEC case have been even greater than in the OSHA case." Dr. Ben-Artzi also asserted he could receive an award "only if [SEC] decides to impose sanctions of at least $1 million on Deutsche Bank." However, if the court concluded the SEC and OSHA actions were community property, Dr. Ben-

Artzi argued the court must determine "which aspects of the award are separate, as with the OSHA claim (i.e., what portions are for personal injury, front pay, etc.)." Dr. Ben-Artzi also argued the court should "determine a net value after expenses, and determine to what extent my efforts to press the matter with the SEC after separation merit an increased percentage of the separate property."

Dr. Ben-Artzi objected to the award of spousal maintenance, imputing income to him for purposes of calculating child support, and the award of attorney fees. Dr. Ben-Artzi did not address the parenting plan or the imposition of foreign travel restrictions.

On May 21, 2014, the court entered a decree of dissolution, findings of fact and conclusions of law, the final parenting plan, and a final order of child support.

The court found that the value of the Charles Schwab IRA "before withdrawals made by Husband in 2013 and 2014" was $139,332. The findings further state, in pertinent part:

> The Husband has committed waste in this matter by his violation of the court's Temporary Restraining Order entered March 26, 2013. The Husband improperly absconded with almost all of the parties' only retirement asset when he liquidated more than $120,000 of a community IRA.

The court awarded each party 50 percent of the net proceeds of the SEC and OSHA actions.

The court imposed foreign travel restrictions in the parenting plan under RCW 26.09.191(3)(g). The court found Dr. Ben-Artzi was a flight risk with the children and "likely to violate any court order to permit travel." The court awarded Gillian maintenance. The court found Dr. Ben-Artzi was voluntarily underemployed and imputed income to him, resulting in a monthly child support obligation of $1,777.60. The

13

court ordered Dr. Ben-Artzi to pay $45,000.00 in attorney fees. The court concluded, "The Husband should be ordered to pay $45,000[.00] of the Wife's attorney fees pursuant to RCW 26.09.140, CR 37 and Washington law on the doctrine of intransigence."

The court found Dr. Ben-Artzi remained in contempt of court for failure to comply with a number of court orders, including the order to provide full and complete responses to discovery, the order to pay child support, and the orders to pay attorney fees.

> The Husband has a pattern of willful disregard for court orders. He has been found in contempt of court twice. He has knowingly and intentionally failed to comply with court rules and court orders for production of discovery and preservation of marital assets. He has had court sanctions and discovery sanctions imposed against him. He has repeatedly been ordered to pay the Wife's attorney fees.
>
> . . . .
>
> The Husband has committed intransigence in this matter. He has knowingly and willfully obstructed this proceeding. His actions have been in bad and [sic] faith and have caused excessive and unnecessary litigation, thereby wasting court time and unreasonably causing the Wife to incur attorney fees. The Husband should be ordered to pay $45,000 of the Wife's attorney fees as a result of his misconduct throughout this matter.

The court awarded Gillian "a marital lien in the amount of $200,583.12 which represents the total judgments awarded to her in this matter as property division, spousal maintenance (alimony), child support, discovery sanctions and attorney fees." The court ruled, "Discharge of the judgments shall reduce this sum accordingly."

On June 10, 2014, Dr. Ben-Artzi filed a notice of appeal of the decree of dissolution, the findings of fact and conclusions of law, the final parenting plan, and the final child support order.

On July 24, the superior court entered an order finding Dr. Ben-Artzi in contempt of court for intentionally failing to comply with the order of child support and the conditions of the decree including the failure to return the money he withdrew from the joint IRA. The court also found Dr. Ben-Artzi remained in contempt for failure to comply with other court orders including the order to produce bank statements.

At the contempt review hearing on August 21, the court found that Dr. Ben-Artzi "failed to comply with any of the purge conditions" and that he "may have fled the United States due to his contempt of court." The court ordered Dr. Ben-Artzi to pay $825 in attorney fees within seven days and entered a $7,000 judgment in favor of Gillian for the daily penalty imposed for discovery violations. The court also ordered Dr. Ben-Artzi to "disclose his physical, residential address" within seven days.

At the contempt review hearing on September 30, the court ordered Dr. Ben-Artzi to pay $500.00 in attorney fees within seven days and entered a $10,000.00 judgment for the "contempt violations from August 21 to date." The court also entered a judgment of $9,401.78 for past due child support, maintenance, and interest.

In November 2014, Dr. Ben-Artzi filed a declaration, stating, "I have now found an excellent job in Israel, close to my family and friends. I will separately file my Israeli address under seal with the Court once the move is complete." Dr. Ben-Artzi asserted he had "not abandoned my children" and planned "to file for a new parenting plan in the very near future."

ANALYSIS

## Motion To Dismiss

Gillian seeks dismissal of the appeal on the grounds that Dr. Ben-Artzi refuses to comply with court orders and has fled the jurisdiction. We deny the motion to dismiss.

As a general rule, a party is not precluded from filing an appeal even if the party is in contempt of court. See Jones v. Jones, 75 Wash. 50, 59, 134 P. 528 (1913). Gillian's reliance on Pike v. Pike, 24 Wn.2d 735, 167 P.2d 401 (1946), is misplaced.

In Pike, the mother absconded with the children after filing an appeal of an interlocutory custody order and "refused to disclose the present abode of herself and children." Pike, 24 Wash. at 736-37. The court entered "an order dismissing the appeal, to take effect on a certain day, . . . unless before that time appellant returns the children to their father in accordance with the interlocutory order." Pike, 24 Wash. at 742-43.

## Standard of Review

Dr. Ben-Artzi challenges (1) imposing international travel restrictions under RCW 26.09.191(3)(g), (2) imputing income for purposes of calculating child support, (3) the characterization and division of property, (4) the award of maintenance, and (5) the award of attorney fees.[7]

We review the parenting plan, the order of child support, the characterization of property awarding Gillian half of the net proceeds in the SEC whistleblower action,

---

[7] After oral argument, Dr. Ben-Artzi filed a supplemental designation of clerk's papers and "Respondent's Declaration Compliance with Court Orders." Gillian objected to the supplemental designation on the grounds that it does not comply with the requirements of either RAP 9.6 or RAP 9.11. Because the supplemental designation does not comply with RAP 9.6 or RAP 9.11, we do not consider it. Dr. Ben-Artzi also filed a motion to consider additional evidence and to withdraw his challenge to the child support order and the parenting plan. Gillian filed an answer. We deny the request to consider additional evidence and the motion to withdraw the appeal of the child support order and the parenting plan.

maintenance, and attorney fees for abuse of discretion. Katare v. Katare, 175 Wn.2d 23, 35, 283 P.3d 546 (2012); In re Marriage of Shui & Rose, 132 Wn. App. 568, 588, 125 P.3d 180 (2005); In re Marriage of Mattson, 95 Wn. App. 592, 604, 976 P.2d 157 (1999); In re Marriage of Bulicek, 59 Wn. App. 630, 633, 800 P.2d 394 (1990). The court abuses its discretion if the decision is manifestly unreasonable or based on untenable grounds or untenable reasons. Katare, 175 Wn.2d at 35.

We review the court's decision to determine whether substantial evidence supports the findings and whether those findings, in turn, support the conclusions of law. Katare, 175 Wn.2d at 35; In re Marriage of Mueller, 140 Wn. App. 498, 503-04, 167 P.3d 568 (2007). Substantial evidence is the quantum of evidence sufficient to persuade a rational fair-minded person the premise is true. Katare, 175 Wn.2d at 35. We review the record "in the light most favorable to the party in whose favor the findings were entered." In re Marriage of Gillespie, 89 Wn. App. 390, 404, 948 P.2d 1338 (1997). We defer to the court's determination on issues of credibility and persuasiveness of the evidence. In re Marriage of Meredith, 148 Wn. App. 887, 891 n.1, 201 P.3d 1056 (2009).

Parenting Plan

Dr. Ben-Artzi contends the court abused its discretion by imposing foreign travel restrictions under RCW 26.09.191(3)(g).[8] Dr. Ben-Artzi contends the findings do not

---

[8] RCW 26.09.191(3) states, in pertinent part:

A parent's involvement or conduct may have an adverse effect on the child's best interests, and the court may preclude or limit any provisions of the parenting plan, if any of the following factors exist:

. . . .

(g) Such other factors or conduct as the court expressly finds adverse to the best interests of the child.

17

support the conclusion that he "is a flight risk with the children."

A trial court has the discretion to impose foreign travel restrictions in a parenting plan based on "factors or conduct as the court expressly finds adverse to the best interests of the child." RCW 26.09.191(3)(g); Katare, 175 Wn.2d at 35-36. The restrictions imposed "must be reasonably calculated to address the identified harm." In re Marriage of Katare, 125 Wn. App. 813, 826, 105 P.3d 44 (2004). Imposition of restrictions on foreign travel is appropriate if the court finds there is "a danger of serious damage" such as abduction, even if the parent "had not yet attempted abduction." Katare, 175 Wn.2d at 36.

Here, the parenting plan states, in pertinent part:

The Father is restricted and restrained from removing a child from the United States unless permitted by subsequent modification of this Parenting Plan. The Father shall not possess or seek to obtain a child's passport, passport card, birth certificate, or enhanced state [identification] card or license unless permitted by subsequent modification of this Parenting Plan. Modification of this Parenting Plan, if any, shall not occur except as provided by law pursuant to RCW 26.09.260.[9]

The findings of fact and conclusions of law state, in pertinent part:

The Husband is a flight risk with the children. These Findings of Fact and Conclusions provide a basis to determine that the Husband may improperly remove the children [from] the United States. He grew up in another country where he remains a citizen, served in the military, and has extensive contacts and influential family members in his country of origin. He is not a United Sates citizen. He has exhibited an extreme disregard for court orders, discovery rules, and his legal and financial duties to the community. The Husband is likely to violate any court order to permit travel. If he did so it would be harmful to the children and cause the Wife to incur substantial attorneys fees and delay to obtain the children's return to the United States. For these reasons, and because it is in the children's best interest, the Husband should be prohibited from international travel with the children as provided in the Parenting Plan.

---

[9] The parenting plan also requires that "[a]ll passports, passport cards, birth certificates, or enhanced state [identification] cards or licenses for a child shall remain in the care and custody of the Mother."

Dr. Ben-Artzi contends that because he violated orders related only to discovery and financial obligations, the finding that he "exhibited an extreme disregard for court orders" does not support the determination that he is likely to violate a court order permitting travel to Israel. We disagree. The undisputed record establishes Dr. Ben-Artzi willfully disregarded court orders and "exhibited an extreme disregard for court orders." Substantial evidence supports the finding that he "is likely to violate any court order to permit travel."

Next, Dr. Ben-Artzi argues that unlike Katare, because Israel is a signatory to the Hague Convention on the Civil Aspects of International Child Abduction, the court erred by imposing travel restrictions.[10]

In Katare, the court affirmed imposition of foreign travel restrictions based on the finding that the father demonstrated a "pattern of abusive behavior" and made "credible threats to abscond with the children" to India. Katare, 175 Wn.2d at 42, 29. The court held that because substantial evidence supported finding "a danger of serious damage (abduction)," the foreign travel restrictions were justified. Katare, 175 Wn.2d at 36, 38. Although the court notes the nonsignatory status of India, that factor was not dispositive. The court relied on evidence of threats made by the father and his pattern of abusive behavior. Katare, 175 Wn.2d at 37-38.[11]

Here, as in Katare, substantial evidence supports the finding that Dr. Ben-Artzi is a flight risk and may improperly remove the children from the United States, and that "[i]f he did so, it would be harmful to the children."

---

[10] See Katare, 175 Wn.2d at 28 n.1.

[11] And contrary to Dr. Ben-Artzi's assertion, Katare does not require expert testimony to determine whether the parent's conduct justifies imposition of travel restrictions in a parenting plan.

Gillian testified Dr. Ben-Artzi had become "very vindictive" and she was concerned he would use his "power to somehow hurt me in a variety of ways, including taking the children." Gillian testified Dr. Ben-Artzi told her she would have no rights in Israel as "a non-Jewish mother," and "therefore he would have custody" of the children. We conclude substantial evidence supports the imposition of foreign travel restrictions.

Child Support

Dr. Ben-Artzi contends the court abused its discretion by imputing income to him based on his historical rate of pay for purposes of calculating child support. We review a trial court's "award of child support, including imputation of income for a voluntarily unemployed or underemployed parent," for abuse of discretion. Shui, 132 Wn. App. at 588.

In determining whether a parent is voluntarily underemployed, the court considers the parent's "work history, education, health, and age, or any other relevant factors." RCW 26.19.071(6).[12] The purpose of the statutory order of priority is to ensure that the amount imputed reflects "the level at which the parent is capable and qualified." In re Marriage of Sacco, 114 Wn.2d 1, 4, 784 P.2d 1266 (1990).

_____

[12] Under RCW 26.19.071(6):

The court shall impute income to a parent when the parent is voluntarily unemployed or voluntarily underemployed. . . . In the absence of records of a parent's actual earnings, the court shall impute a parent's income in the following order of priority:

(a) Full-time earnings at the current rate of pay;

(b) Full-time earnings at the historical rate of pay based on reliable information, such as employment security department data;

(c) Full-time earnings at a past rate of pay where information is incomplete or sporadic;

(d) Full-time earnings at minimum wage in the jurisdiction where the parent resides if the parent has a recent history of minimum wage earnings, is recently coming off public assistance, aged, blind, or disabled assistance benefits, pregnant women assistance benefits, essential needs and housing support, supplemental security income, or disability, has recently been released from incarceration, or is a high school student;

(e) Median net monthly income of year-round full-time workers as derived from the United States bureau of census, current population reports, or such replacement report as published by the bureau of census.

The court did not abuse its discretion by imputing income to Dr. Ben-Artzi based on his "historical rate of pay" under RCW 26.19.071(6)(b). Dr. Ben-Artzi has a PhD in mathematics from the "number one applied mathematics school in the country." After receiving his PhD, Dr. Ben-Artzi worked at Citigroup earning a base salary between $125,000 and $150,000. In January 2008, Dr. Ben-Artzi earned $132,551 at Goldman Sachs, and in 2011, he earned $160,000 at Deutsche Bank. But other than the semester he worked at Ohio State University, Dr. Ben-Artzi was unwilling to pursue employment after he was terminated from Deutsche Bank.

Division of Property

Dr. Ben-Artzi asserts the division of property is not just and equitable. He contends the court abused its discretion by awarding Gillian all of the funds in the IRA and half of the net proceeds in the SEC whistleblower action. Dr. Ben-Artzi does not challenge the award of 50 percent of the net proceeds from the OSHA action.

In a dissolution action, the trial court must order a "just and equitable" distribution of the parties' assets and liabilities, whether community or separate. RCW 26.09.080. All property, both separate and community, is before the court for distribution. Farmer v. Farmer, 172 Wn.2d 616, 625, 259 P.3d 256 (2011). The characterization of the property as community or separate "is a relevant factor which must be considered, but it is not controlling." In re Marriage of Konzen, 103 Wn.2d 470, 478, 693 P.2d 97 (1985).

> Although under RCW 26.09.080 the trial court in a dissolution proceeding must consider the character and status of property before distribution, the actual characterization of property as community or separate is not essential to the exercise of discretion by the trial court in distributing assets and liabilities.

In re Marriage of Brewer, 137 Wn.2d 756, 770, 976 P.2d 102 (1999).

21

The court's characterization of property as separate or community presents a mixed question of law and fact. We review factual findings supporting the characterization for substantial evidence. Mueller, 140 Wn. App. at 503-04. The ultimate characterization of property as community or separate is a question of law we review de novo. Mueller, 140 Wn. App. at 503-04.

In reaching a just and equitable property division, the trial court must consider (1) the nature and extent of the community property, (2) the nature and extent of the separate property, (3) the duration of the marriage, and (4) the economic circumstances of each spouse at the time the property division is to become effective. RCW 26.09.080; In re Marriage of Rockwell, 141 Wn. App. 235, 242, 170 P.3d 572 (2007). But these factors are not exclusive. RCW 26.09.080; In re Marriage of Crosetto, 82 Wn. App. 545, 556, 918 P.2d 954 (1996).

Because the trial court is in "the best position to assess the assets and liabilities of the parties," it has "broad discretion" to determine what is just and equitable under the circumstances. Brewer, 137 Wn.2d at 769. A just and equitable division "does not require mathematical precision, but rather fairness, based upon a consideration of all the circumstances of the marriage, both past and present, and an evaluation of the future needs of parties." Crosetto, 82 Wn. App. at 556. The court has the discretion to award the separate property of one party to the other in appropriate circumstances. In re Marriage of DewBerry, 115 Wn. App. 351, 366, 62 P.3d 525 (2003); In re Marriage of White, 105 Wn. App. 545, 549, 20 P.3d 481 (2001).

We will seldom modify a trial court's division of property and assets on appeal. In re Marriage of Muhammad, 153 Wn.2d 795, 808, 108 P.3d 779 (2005). The party who

challenges such a decision bears a heavy burden to show a manifest abuse of discretion on the part of the trial court. Muhammad, 153 Wn.2d at 808. A court abuses its discretion if its decision is outside the range of acceptable choices or based on untenable grounds or untenable reasons. In re Marriage of Littlefield, 133 Wn.2d 39, 47, 940 P.2d 1362 (1997).

IRA

Dr. Ben-Artzi contends the court abused its discretion by awarding Gillian "100 percent" of the funds remaining in the IRA. We disagree. Substantial evidence supports the finding that Dr. Ben-Artzi "committed waste" when he "improperly absconded with almost all of the parties' only retirement asset." Between May 2013 and March 2014, Dr. Ben-Artzi withdrew approximately $120,000 from the joint IRA resulting in a loss of $10,000 in federal tax penalties. The value of the account before withdrawals by Dr. Ben-Artzi was approximately $139,332. The court did not abuse its discretion by ordering Dr. Ben-Artzi to pay Gillian the amount withdrawn and awarding the remaining funds in the IRA to Gillian.

SEC Whistleblower Action

Dr. Ben-Artzi argues the SEC action is a mere expectancy that is not subject to division in the dissolution proceeding. In the alternative, Dr. Ben-Artzi claims the court erred in mischaracterizing the potential award for emotional distress, punitive damages, and future lost wages and awarding each party 50 percent of the net proceeds in the SEC whistleblower action.

The court found that based on "all the circumstances of this case" including Dr. Ben-Artzi's refusal to comply with court orders to provide responses to discovery or "pay

23

[Gillian] as required by prior Orders of [the] Court, . . . a fair allocation of net litigation proceeds is 50% / 50%." The decree states, in pertinent part:

Property to be Awarded the Husband

Except as specifically awarded to the Wife, the Husband is awarded as his separate property all of the following:

. . . .

> 50% of the net proceeds, damages or any monetary losses, earnings, claims, compensation, fees, rewards, entitlements, unpaid or lost wages, contingent future interests, costs, disbursements, awards, wrongful termination, punitive damages, or any other such monetary dispensation (distribution, payment, etc[.]) in any action, litigation, wrongful discharge, administrative proceeding, case, cause, or any other such legal case, court matter or administrative proceeding including, without limitation, the whistleblower matter before [OSHA] and its derivative or related proceedings, the whistleblower matter before [SEC] and its derivative or related proceedings, except as specifically provided below and otherwise awarded to the Wife. "Net proceeds" is defined in the Findings of Fact and Conclusions of Law in this matter. Based on all the circumstances of this case, including Husband's failure to pay Wife as required by prior Orders of this Court, the Court finds that a fair allocation of net litigation proceeds is 50% / 50%.

The court defined "net proceeds" as "the gross proceeds received" in a judgment, settlement, or award, minus "attorney fees and testifying expert fees."

The findings of fact and conclusions of law further state, in pertinent part:

The parties have the following community property:

> Net proceeds of litigation and/or potential litigation arising from events which occurred during or in relation to Husband's employment with Deutsche Bank. This includes proceeds, damages, monetary losses, earnings, claims, compensation, fees, rewards, entitlements, unpaid or lost wages, contingent future interests, costs, disbursements, awards, wrongful termination, punitive damages, or any other such monetary dispensation (distribution, payment, etc[.]) in any action, litigation, wrongful discharge, administrative proceeding, case, cause, or any other

such legal case, court matter or administrative proceeding
including, without limitation, the whistleblower matter before
[OSHA] and its derivative or related proceedings, and the
whistleblower matter before [SEC] and its derivative or related
proceedings.

The court specifically awarded future lost wages to Dr. Ben-Artzi as his separate

property. The findings of fact state, in pertinent part:

Each party has separate property consisting of his or her accumulated
income, belongings, retirement, etc., obtained after March 26, 2013.

. . . .

The Husband has no other separate property, except for the Center for
Model Risk Research, potential future lost wages after March 26, 2013,
and the non-community portion, if any, of possible emotional damages
after March 26, 2013 with respect to the foregoing whistleblower action(s).

The court ordered Dr. Ben-Artzi to pay all attorney fees, costs, and expenses

incurred with attorneys and others for the SEC and OSHA actions.

The Husband should be ordered to pay all attorney fees, costs and
expense he has incurred or will incur with Kristen Reid, Ronald Hardesty,
David Starks, Thad Guyer, Jordon Thomas, Adrian Fournier, McKinley
Irvin, Belcher Swanson, Labaton & Sucharow, Kilgour Williams Group, or
any other attorney with respect to any and all matters including, without
limitation, this matter, [SEC], [OSHA] or any other such agency, entity,
business, employer, or third party with respect to any proceeding, matter
or cause of action.

First, Dr. Ben-Artzi argues the court erred in awarding Gillian 50 percent of the

net proceeds because the SEC action is a mere expectancy that is not subject to

division. We disagree. "Enforceable contract rights and contingent future interests,

such as lawsuit proceeds and fee arrangements, are all property interests subject to

characterization as separate or community property for distribution purposes." In re

Estate of Duxbury, 175 Wn. App. 151, 161, 304 P.3d 480 (2013). " 'The law has long

recognized that a contingent future interest is property no matter how improbable the

contingency.' " In re Marriage of Leland, 69 Wn. App. 57, 71, 847 P.2d 518 (1993) (quoting In re Marriage of Brown, 15 Cal. 3d 838, 126 Cal. Rptr. 633, 638 n.8 (1976)). " 'The fact that a contractual right is contingent upon future events does not degrade that right to an expectancy.' " Leland, 69 Wn. App. at 71 (quoting Brown, 126 Cal. Rptr. at 638 n.8). An expectancy " 'is not to be deemed an interest of any kind.' " Leland, 69 Wn. App. at 71[13] (quoting Brown, 126 Cal. Rptr. at 638 n.8).

The undisputed record supports finding the SEC action is a contingent future interest subject to division. Consistent with well-established case law, Gillian's expert described the difference between a contingent future interest and an expectancy. Brewe states, in pertinent part:

> An expectancy is a mere hope, based upon no direct provision, promise, or trust. An expectancy is the possibility of receiving a thing, rather than having a vested interest in it. . . . Because expectancies are such tenuous interests, they are not property rights subject to division. In re Estate of Baird, 131 Wn.2d 514, 521-22, 933 P.2d 1031 (1997).[14]

On the other hand, Brewe states:

> A contingent future interest is a vested interest . . . but the interest can only be exercised upon the happening of a future event, and the future event is not certain to occur. . . . Contingent future interests are property rights subject to division. [Leland, 69 Wn. App. 71].[15]

The evidence at trial supports the court's determination that the SEC action is a contingent future interest and not a mere expectancy. The undisputed evidence established the SEC action is a vested contingent action subject to division. Brewe testified that because Dr. Ben-Artzi "filed an actual claim for the award with the SEC, . . . his interest is vested, but the interest is contingent upon the SEC acting against

---

[13] Internal quotation marks omitted.
[14] Emphasis in original.
[15] Emphasis in original.

Deutsche Bank" and imposing sanctions of over $1 million. The SEC must award between 10 percent and 30 percent of the money collected in an SEC enforcement action that results in sanctions of over $1 million. See 17 C.F.R. §§ 240.21F-3(a), .21F-5(b).

The case Dr. Ben-Artzi relies on, Freeburn v. Freeburn, 107 Wash. 646, 182 P. 620 (1919), is distinguishable. In Freeburn, the husband received a monthly salary and dividends under a mining contract that was set to expire. Freeburn, 107 Wash. at 650. The court declined to treat the proceeds of a hypothetical renewal of the contract as property subject to division, stating, "It is mere speculation to suggest that this contract may be renewed upon the same or any terms whatever." Freeburn, 107 Wash. at 650.

In the alternative, Dr. Ben-Artzi claims that if the SEC action is subject to division in the dissolution, the court erred in failing to take into consideration his right to reimbursement for his postseparation work on the SEC action. The record does not support his argument.

Gillian testified Dr. Ben-Artzi "pursued these legal cases since 2010" and the "investigations became his full-time job in June 2011." Dr. Ben-Artzi refused to provide in discovery the information concerning his efforts. Under CR 37, the court excluded any evidence Dr. Ben-Artzi did not produce during discovery. Dr. Ben-Artzi did not respond to discovery requesting information about his work on the SEC action and the fees paid to attorneys and experts in connection with the SEC and OSHA actions.

Dr. Ben-Artzi also argues the court abused its discretion in requiring him to pay the attorney and expert fees incurred in pursuing the SEC action. Based on the undisputed record, the court did not err in requiring Dr. Ben-Artzi to pay attorney fees

and expert costs. The evidence at trial established Dr. Ben-Artzi retained attorneys to file the SEC and OSHA claims during the marriage and paid experts using community funds.

Next, Dr. Ben-Artzi claims the court erred in failing to characterize emotional damages and future earnings as separate property. It is well established that any award of emotional damages is separate property and future lost wages may be separate property. In re Marriage of Brown, 100 Wn.2d 729, 738, 675 P.2d 1207 (1984); In re Marriage of Kraft, 119 Wn.2d 438, 451, 832 P.2d 871 (1992). The court awarded Dr. Ben-Artzi future lost wages. The court also found that if Dr. Ben-Artzi receives "damages for emotional distress," that portion would be separate property.

Nonetheless, to the extent the court did not accurately characterize future lost wages and emotional damages, remand is not necessary. Mischaracterization of property requires remand only if we conclude "(1) the trial court's reasoning indicates that its division was significantly influenced by its characterization of the property, and (2) it is not clear that had the court properly characterized the property, it would have divided it in the same way." In re Marriage of Shannon, 55 Wn. App. 137, 142, 777 P.2d 8 (1989).

Here, the record establishes the court's decision to award each party 50 percent of the net proceeds from the SEC and OSHA actions was not significantly influenced by the characterization of future lost wages and emotional damages. The court explicitly found that "[b]ased on all the circumstances of this case, including Husband's failure to pay Wife as required by prior Orders of this Court, . . . a fair allocation of net litigation

proceeds is 50% / 50%." The court did not err in concluding an equal division of the net proceeds of the SEC action was just and equitable.

Life Insurance Policy

Dr. Ben-Artzi contends the provision in the decree that requires him to obtain a life insurance policy for the benefit of Gillian is ambiguous as to whether he must pay the premiums. In the alternative, Dr. Ben-Artzi argues that if he must pay the premiums, it is an abuse of discretion.

The decree states Gillian "shall be permitted to maintain a life insurance policy insuring the Husband's life for so long as he owes any obligations to her or regarding a child under any court order." The findings specifically state:

> Because of the Husband's intransigence and pattern of misconduct, he should be ordered to pay the Wife for her to maintain a life insurance policy insuring his own life for so long as he has obligations owed to her or [their] children under the Decree or an Order of Child Support.

The plain and unambiguous language requires Dr. Ben-Artzi to pay Gillian the amount necessary for her to maintain the life insurance policy. Substantial evidence also supports the finding that because of Dr. Ben-Artzi's intransigence and pattern of misconduct, he should pay Gillian the amount necessary for her to maintain the life insurance policy. The court did not abuse its discretion in ordering Dr. Ben-Artzi to pay Gillian the amount necessary for her to pay the premiums for the life insurance policy.

Maintenance

Dr. Ben-Artzi contends the court abused its discretion in awarding maintenance. An award of maintenance is within the broad discretion of the trial court. Bulicek, 59 Wn. App. at 633. The only limitation on the amount and duration of maintenance under

29

RCW 26.09.090 is that the award must be just. In re Marriage of Luckey, 73 Wn. App. 201, 209, 868 P.2d 189 (1994).

The court found Gillian "is more likely to be in greater need of funds during this next year as her employment situation is not fully stabilized." The court ordered Dr. Ben-Artzi to pay "maintenance at $3,000 per month for the first year and at $2,500 a month for the next two years." Substantial evidence supports the award of maintenance.

After Gillian gave birth to their first child in 2007, the couple agreed she should stop working and be a "stay-at-home mother." At the time of trial, Gillian was employed as a "long-term substitute" teacher but hoped "to find a permanent position at the school where I work" and eventually earn the salary of "a full-time regularly appointed teacher."

Attorney Fees

Dr. Ben-Artzi contends the court abused its discretion by awarding Gillian attorney fees. The party challenging an award of attorney fees has the burden of proving the court abused its discretion by making a decision that is clearly untenable or manifestly unreasonable. Mattson, 95 Wn. App. at 604.

After deducting $7,000 that "would have been incurred by her in the absence of the intransigence on Dr. Ben-Artzi's part," the court awarded Gillian $68,493 in attorney fees. Substantial evidence supports the court's finding of intransigence and the award of fees. Dr. Ben-Artzi's refusal to comply with the discovery rules and multiple court orders resulted in significant delay and additional expense. The court did not abuse its discretion by awarding Gillian attorney fees.

We affirm in all respects. Upon compliance with RAP 18.1, we award Gillian fees on appeal. See RCW 26.09.140; Mattson, 95 Wn. App. at 605-06.

WE CONCUR: